UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ADAH BAUCOM,

                Plaintiff,                                Hon. Richard Alan Enslen

v.                                              Case No. 1:03-CV-134

COMMISSIONER OF SOCIAL
SECURITY,

                Defendant.

_____/


## REPORT AND RECOMMENDATION

      This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act.  Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive.

      The Commissioner determined that Plaintiff is not disabled as defined by the Act. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

2

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.


## **PROCEDURAL POSTURE**

Plaintiff was 46 years of age at the time of the ALJ's decision. (Tr. 14). She successfully completed high school and worked previously as a machine operator and certified nursing assistant. (Tr. 59, 64, 83-86).

Plaintiff applied for benefits on August 25, 2000, alleging that she had been disabled since August 1, 1998, due to vision impairments. (Tr. 48-50, 58). Plaintiff's application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 32-46). On October 4, 2002, Plaintiff appeared before ALJ Thomas Walters, with testimony being offered by Plaintiff and vocational expert, Donald Hecker. (Tr. 836-69). In a written decision dated October 24, 2002, the ALJ determined that Plaintiff was not disabled. (Tr. 537-46). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 555-56). Plaintiff subsequently appealed the matter in this Court pursuant to 42 U.S.C. § 405(g).

On July 29, 2003, the present matter was remanded to permit Defendant to "continue searching for the missing claim file and hearing cassette tape." (Tr. 551-52, 557). Before initiating the present appeal, Plaintiff filed another application for benefits. (Tr. 750-52). This claim was denied, after which Plaintiff requested a hearing before an ALJ. (Tr. 737-49). Plaintiff's two applications for benefits were subsequently combined. (Tr. 13).

3

On June 8, 2004, Plaintiff appeared before ALJ Lawrence Blatnik, with testimony being offered by Plaintiff and vocational expert, Sharon Princer. (Tr. 782-835). In a written decision dated September 22, 2004, the ALJ determined that Plaintiff was not disabled. (Tr. 13-24). Because the Court retained jurisdiction following remand, the matter then returned to this Court.

## MEDICAL HISTORY

### I.     Knee Impairment

On December 26, 1995, Plaintiff twisted her right knee suffering a tear of the medial meniscus. (Tr. 99-102). On March 21, 1996, Dr. David Detrisac performed arthroscopic surgery to repair Plaintiff's right knee. (Tr. 116-17).

On May 15, 1996, Plaintiff was examined by Dr. Detrisac. (Tr. 108). Plaintiff walked with a "very minimal" limp and reported that her condition was "improving." An examination of Plaintiff's knee was unremarkable. *Id.* A June 19, 1996 examination of Plaintiff's right knee revealed no evidence of tenderness, instability, or limitation of movement. (Tr. 109). On September 11, 1996, Plaintiff was examined by Dr. Detrisac. (Tr. 118). Plaintiff was "virtually asymptomatic" and was cleared to return to work without restrictions. *Id.*

Plaintiff subsequently began to again experience pain in her right knee, which doctors concluded represented either a recurrent or unhealed meniscal tear. (Tr. 118-26, 184). On April 28, 1997, Dr. Julie Dodds performed arthroscopic surgery on Plaintiff's right knee. (Tr. 186-87).

On June 10, 1997, Plaintiff was examined by Dr. Dr. Monte Haber. (Tr. 175). Plaintiff reported that she "has less pain in her right knee and has more range of motion" and was

4

able to "perform all activities at home." Plaintiff exhibited 4+/5 strength and was able to flex her knee to 100 degrees. Plaintiff was instructed to continue participating in physical therapy. *Id.*

On September 2, 1997, Plaintiff was examined by Dr. Mark Davis. (Tr. 164). Plaintiff reported that her condition had improved, but that she was experiencing difficulty standing "for distances and long periods of time." An examination of her right knee revealed no evidence of effusion or instability. Plaintiff was instructed to continue participating in physical therapy. *Id.*

Treatment notes dated October 24, 1997, reveal that Plaintiff had not attended physical therapy in three weeks. (Tr. 160). A physical therapy report dated October 29, 1997, indicates that Plaintiff has "a history" of non-attendance. (Tr. 159).

On November 13, 1997, Plaintiff was examined by Dr. Dodds. (Tr. 157). An examination of Plaintiff's knee revealed "some" tenderness over the mid-medial joint line and "mild" lateral joint line tenderness. Plaintiff exhibited full range of knee motion. There was no evidence of knee swelling and McMurray's test[1] was negative. Plaintiff was instructed to continue participating in therapy. *Id.*

On December 4, 1997, Plaintiff was discharged from physical therapy for "non-compliance." (Tr. 155). The therapist noted that Plaintiff had only twice attended therapy. *Id.*

On April 14, 1998, Dr. Dodds reported that Plaintiff could perform work activities subject to the following limitations: (1) no squatting, (2) no kneeling, (3) no lifting more than 20 pounds, and (4) she can stand for 8 hours each day, but must be able to sit for 10 minutes every two hours. (Tr. 150). The doctor reported that these restrictions were "permanent." *Id.*

---

[1] McMurray's sign refers to the occurrence of a clicking sound during the manipulation of the knee, which is indicative of an injury of a meniscus of the knee joint. J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* M-72 (Matthew Bender) (1996).

On October 6, 1998, Plaintiff reported that her right knee "has been doing well." (Tr. 139). An examination of her knee revealed no evidence of effusion or joint line tenderness and she exhibited full active and passive range of motion. *Id.*

On April 6, 1999, Plaintiff was examined by Dr. Keith Sequeira. (Tr. 136). Plaintiff was "mildly" tender to palpation along the medial collateral ligament and medial joint line on the right. She exhibited full active and passive range of motion. Lachman's sign[2] and McMurray's test were both negative. *Id.* X-rays of Plaintiff's knee revealed "minimal" degenerative changes and no evidence of arthritis. (Tr. 136, 418). Plaintiff was instructed to continue working subject to the limitations identified above. (Tr. 136).

On July 8, 1999, Plaintiff participated in a consultive examination performed by Dr. Dean Olson. (Tr. 439-44). Plaintiff reported that she was experiencing "moderate" (and sometimes "severe") pain in her right knee. (Tr. 439). She was able to arise from a chair without difficulty and walked with a normal gait. (Tr. 442). Straight leg raising was negative and Plaintiff exhibited a full range of motion in her knees and hips. *Id.* The doctor concluded that Plaintiff was capable of performing work activities subject to the limitations identified above. (Tr. 444).

On July 27, 1999, Plaintiff reported that "she would be physically capable, insofar as her knee is concerned, of continuing to work with the restrictions recommended by her physicians." (Tr. 441).

On December 22, 2000, Plaintiff participated in a consultive examination conducted by Dr. Mark Schaar. (Tr. 470-78). Plaintiff reported that she was not taking all of her prescribed

---

[2] Lachman's test is used to determine whether a patient has suffered a rupture of the anterior cruciate ligament. *See*, *e.g.*, Lachman's Test, *available at*, http://www.fpnotebook.com/ORT85.htm (last visited on March 22, 2004).

6

medication.  (Tr. 471-72).  An examination of Plaintiff's lower extremities revealed "mildly" reduced range of motion in Plaintiff's right knee with no evidence crepitus.  (Tr. 473).  Plaintiff exhibited "good" distal pulses, "good" capillary refill, and no edema.  Plaintiff walked with a normal gait and was able to heel/toe walk without difficulty.  Romberg testing[3] was also negative.  *Id.*

X-rays of Plaintiff's right knee, taken on January 4, 2001, revealed no evidence of fracture, dislocation, or bony abnormality.  (Tr. 479).  The joint space was "well maintained" and the patella was "in good alignment."  *Id.*

On June 4, 2003, Plaintiff was examined by Dr. Meredith Heisey.  (Tr. 649-50). Plaintiff reported that she was experiencing a "constant aching sensation" in her right lower extremity. (Tr. 649). An examination of Plaintiff's right knee revealed "localized areas of swelling" with "very minimal effusion."  (Tr. 650).  Plaintiff exhibited diffuse tenderness to palpation, but there was no evidence of cysts or swelling.  Plaintiff exhibited full (and pain free) range of knee motion.  McMurray's test was negative.  Patellar stability was within normal limits.  Varus and valgus testing was likewise within normal limits.  *Id.*

On August 8, 2003, Plaintiff was examined by Dr. Wade Cooper.  (Tr. 625-27). Plaintiff reported that she was experiencing a "burning-like" pain sensation in her lower extremities. (Tr. 625).  Plaintiff exhibited 5/5 strength throughout her extremities and the results of a nerve conduction study were "normal."  (Tr. 626).  Plaintiff exhibited no gait, sensory or coordination deficits.  The doctor concluded that the etiology of Plaintiff's complaints was "unclear."  *Id.*

---

[3]  Romberg test is a neurological test designed to detect poor balance.  *See* Romberg Test, available at http://www.mult-sclerosis.org/RombergTest.html (last visited on July 8, 2005).  The patient stands with her feet together and eyes closed.  The examiner will then push her slightly to determine whether she is able to compensate and regain her posture.  *Id.*

## II.            Vision Impairment

In the summer of 1996, Plaintiff began experiencing blurred vision with increasing cephalgia.[4]  (Tr. 229).   Subsequent examinations indicated that Plaintiff was experiencing sarcoidosis.[5]  Plaintiff's vision improved with Prednisone, but because of adverse side effects her dosage was decreased.  An angiogram examination conducted in September 1997 revealed "findings consistent with macular edema without vasculitis or disc edema."  *Id.*

On January 27, 1998, Plaintiff was examined by Dr. Eric Eggenberger.  (Tr. 229-30). Plaintiff reported that "her visual function has been stable over the last 4-5 months on topical and low dose oral Prednisone."  (Tr. 229).  Plaintiff reported, however, that she was experiencing persistent headaches "characterized by bilateral throbbing pain with phono- and photophobia."  *Id.* Plaintiff's visual acuity was measured as 20/40 without correction.  (Tr. 230).  An examination of Plaintiff's occular motility[6] revealed no abnormalities and there was no evidence of nystagmus.[7]  The doctor diagnosed Plaintiff with "decreased visual function OU consistent with uveitis with macular edema, most logically related to sarcoidosis.  There is no strong evidence per our examination to

---

[4]  Cephalgia refers to "the common headache."  J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* C-120 (Matthew Bender) (1996).

[5]  Sarcoidosis involves inflammation that produces tiny granulomas (lumps of cells) in various organs in the body.  The granulomas are very small and can be seen only with a microscope.  However, these granulomas can grow and clump together, making many large and small groups of lumps.  If many granulomas form in an organ, they can affect the organ's function. Sarcoidosis usually originates in the lungs or the lymph nodes and can also affect the skin, eyes, and liver.  *See* What is Sarcoidosis?, available at http://www.nhlbi.nih.gov/health/dci/Diseases/sarc/sar_whatis.html (last visited on May 3, 2006).

[6]  Motility refers to the ability to perform spontaneous movement.  J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* M-257 (Matthew Bender) (1996).

[7]  Nystagmus refers to an abnormal or involuntary movement of the eyeballs.  J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* N-165 (Matthew Bender) (1996).

implicate an optic neuropathy or neuro-ophthalmic pathology." The doctor also noted that Plaintiff was experiencing episodic cephalgia. *Id.*

On January 29, 1998, Plaintiff participated in an MRI examination of her brain and ocular orbits, the results of which were "normal" with no evidence of abnormality of Plaintiff's optic nerves or orbital muscles. (Tr. 276-77).

On August 11, 1998, Plaintiff was examined by Dr. Raphael Addiego. (Tr. 225). Plaintiff's visual acuity was measured as "20/30- OD and 20/40- OS." An examination of Plaintiff's eyes revealed a "small amount of far peripheral hemorrhage inferotemporally in the left eye" and "fading hemorrhage" in the right eye without evidence of peripheral vasculitis. Furthermore, there was no evidence of vascular inflammation or disc edema in either eye. *Id.*

On January 28, 1999, Plaintiff was examined by Dr. Addiego. (Tr. 224). Plaintiff's visual acuity was measured as "20/80 without correction and 20/40 best corrected." An examination of Plaintiff's eyes revealed the following:

> The periphery was fully attached in each eye with minimal periphlebitis distally inferiorly OD and a small area of microaneurysm formation and blot intraretinal hemorrhage temporally. Definite retinal neovascularization was not seen in either eye. Again, no holes, tears, or detachment were noted. Posteriorly the disc, vessels, and macula showed no acute changes. There was no disc or macular edema nor neovascularization seen.

*Id.*

On July 15, 1999, Dr. Addiego reported that Plaintiff was experiencing "ocular inflammation" which caused retinal swelling. (Tr. 215). The doctor reported that Plaintiff's vision was reduced to "20/80 in both eyes without correction, and only improves to 20/50 in the right eye best corrected and does not improve in the left eye with glasses." The doctor concluded that Plaintiff

9

was "restricted by the level of visual acuity and by the loss of depth perception that accompanies this reduction in visual performance." Accordingly, the doctor concluded that "[t]his limits [Plaintiff's] ability to safely perform activities requiring normal depth perception and visual acuity for safe machine operation. It is possible for [Plaintiff] to work if accommodations are made to allow for jobs that can be performed safely at this level of vision." *Id.*

On June 21, 1999, Plaintiff participated in an MRI examination of her brain, the results of which were "normal." (Tr. 282).

On November 5, 1999, Plaintiff was examined by Dr. Addiego. (Tr. 209). The doctor reported that Plaintiff exhibited "significant visual improvement today in the right eye and mild visual improvement in the left eye." Specifically, Plaintiff's visual acuity was measured as "20/70 at distance and 20/50 at near OD without correction, and 20/50 OD and 20/25 OS at near without correction." The doctor reported that Plaintiff's "current level of near visual acuity appears adequate to read most sizes of print and perform nearer tasks adequately. She would also likely have improved depth perception for her work tasks." *Id.*

On March 1, 2000, Plaintiff participated in whole body gallium scan, the results of which were consistent with sarcoidosis. (Tr. 200).

On March 15, 2000, Dr. Addiego reported that Plaintiff "is showing improvement in her uveitis, particularly her vitreous cell, in addition to some improvement in vision OD." (Tr. 199). Specifically, the doctor reported that Plaintiff exhibited "visual improvement to 20/60 in the right today and is 20/50 in the left." The doctor further reported that "the overall vitreous haze appears to be improved with clearer view in each eye than on recent examinations." *Id.*

An April 13, 2000 examination measured Plaintiff's visual acuity as "20/60- OD and 20/50- OS without correction at distance, and 20/40- OD and 20/30+ OS at near." (Tr. 198). The examination revealed no evidence of disc edema or vasculitis in either eye. *Id.*

On December 22, 2000, Plaintiff participated in a consultive examination conducted by Dr. Schaar. (Tr. 470-78). Despite claiming that she experiences vision difficulties, Plaintiff reported that she drives an automobile and was recently given a driver's license. (Tr. 470). An examination of Plaintiff's eyes revealed that her pupils were "equal and reactive to light" and "the extraocular motion is intact." (Tr. 472). The doctor was unable, however, to complete his examination of Plaintiff's eyes due to Plaintiff's "noncompliance with holding her eyes still during the exam." *Id.*

On June 24, 2002, Plaintiff reported that recent medical treatment "helped her vision" and that her sight was "better than what it has been ever before." (Tr. 530).

Treatment notes dated July 2, 2002, indicate that Plaintiff was continuing to drive an automobile. (Tr. 531).

On November 6, 2002, Plaintiff was examined by Dr. Susan Elner. (Tr. 613). Plaintiff's visual acuity was measured as 20/60 on the right and 20/200 on the left with "normal" intraocular pressure. The doctor observed "pronounced" inflammation in Plaintiff's left eye and "improving" inflammation in her right eye. *Id.*

On November 18, 2003, Plaintiff was examined by Dr. Addiego. (Tr. 678-79). Plaintiff's visual acuity was measured as "20/40 in the right eye and 20/50- in the left with best correction." (Tr. 678). The doctor observed a "mild" amount of inflammation, as well as "some"

synechiae[8] in each eye.  There was, however, no evidence of retinitis, vasculitis, or disc edema in either eye.  The doctor noted that Plaintiff's vision had improved since March 2002.  *Id.*

Following a January 7, 2004 examination, Dr. Addiego reported that Plaintiff was "reasonably stable with respect to her ocular difficulties."  (Tr. 725).

On February 25, 2004, Plaintiff's best corrected visual acuity was measured as "20/40- in the right eye and 20/50- in the left."  (Tr. 714).

On May 26, 2004, Dr. Addiego reported that Plaintiff was suffering "a moderate reduction in visual sharpness causing difficulties with reading and other visual functions." (Tr. 736).

At the administrative hearing, Plaintiff testified that she continues to drive an automobile.  (Tr. 789).

III.         **Depression**

On October 26, 2000, Plaintiff participated in a consultive examination conducted by Steve Geiger, Ph.D.  (Tr. 445-50).  Plaintiff reported that she felt hopeless and worthless, but denied experiencing depression or anxiety.  (Tr. 445-46).  The results of a mental status examination were unremarkable.  (Tr. 447-49).  Plaintiff was diagnosed with "mild" mood disorder and her GAF score was rated as 55.[9]  (Tr. 449).

---

[8]  Synechia is a condition in which one part adheres to another; especially, in the eye, the attachment of the iris either to the cornea in front or to the lens in the back.  J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* S-444 (Matthew Bender) (1996).

[9]  The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 30 (4th ed. 1994) (hereinafter DSM-IV).  A GAF score of 55 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning."  DSM-IV at 34.

On November 20, Dr. Ashok Kaul completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 452-65). Determining that Plaintiff suffered from a mild mood disorder, the doctor concluded that Plaintiff satisfied the Part A criteria for Section 12.04 (Affective Disorders) of the Listing of Impairments. (Tr. 453-61). The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for this particular impairment. (Tr. 462). Specifically, the doctor concluded that Plaintiff suffered moderate restrictions in the activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and never experienced episodes of deterioration or decompensation in work or work-like settings. *Id.*

Dr. Kaul also completed a Mental Residual Functional Capacity Assessment form regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. (Tr. 466-69). Plaintiff's abilities were characterized as "moderately limited" in four categories. With respect to the remaining 16 categories, however, the doctor reported that Plaintiff was "not significantly limited." *Id.*

## IV.        Breathing Impairment

On August 22, 1997, Plaintiff participated in a pulmonary function evaluation, the results of which revealed "mildly reduced diffusion capacity." (Tr. 510).

X-rays of Plaintiff's chest, taken on March 16, 1999, were unremarkable with no evidence of acute cardiac or pulmonary abnormality. (Tr. 324).

X-rays of Plaintiff's chest, taken on May 25, 2000, were "normal." (Tr. 272).

On December 22, 2000, Plaintiff participated in a consultive examination conducted by Dr. Schaar. (Tr. 470-78). Plaintiff reported that she "wheezes frequently" and "it hurts to breathe." (Tr. 471). She reported that she treated her breathing difficulties 2-3 times daily with an inhaler. (Tr. 472). Plaintiff reported that she had been using the same inhaler (without a refill) for the previous four months. However, when the doctor examined Plaintiff's inhaler, he observed that it was "pretty much full." *Id.* The results of a physical examination were unremarkable. (Tr. 473).

On June 24, 2002, Plaintiff reported that she was not experiencing shortness of breath or any other pulmonary symptoms. (Tr. 529).

On July 31, 2002, Plaintiff participated in a pulmonary function examination, the results of which revealed "only very mild abnormalities." (Tr. 614).

On July 23, 2003, Plaintiff participated in a pulmonary function examination, the results of which revealed a "mild" ventilatory obstructive defect. (Tr. 646).

## ANALYSIS OF THE ALJ'S DECISION

### A. Applicable Standards

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[10] If the Commissioner can make a

---

[10] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

dispositive finding at any point in the review, no further finding is required.  *See* 20 C.F.R. §§ 404.1420(a), 416.920(a).  The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity.  *See* 20 C.F.R. §§ 404.1545, 416.945.

## B.  The ALJ's Decision

The ALJ determined that Plaintiff suffers from the following severe impairments: (1) sarcoidosis and related uveitis with vasculitis and cystoid macular edema; (2) arthritis of the right knee and a history of right knee meniscectomy; (3) a breathing disorder; and (4) a mood disorder. (Tr. 18).  The ALJ concluded that these impairments, whether considered alone or in combination, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  *Id.*  The ALJ determined that while Plaintiff was unable to perform her past relevant work, there existed a significant number of jobs which she could perform despite his limitations.  (Tr. 18-22).  Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

### 1.  The ALJ's Decision is Supported by Substantial Evidence

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience,

---

5.  If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted above, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform work activities subject to the following restrictions: (1) she can occasionally lift or carry 20 pounds and can frequently lift or carry 10 pounds; (2) in an 8-hour workday, she can sit, stand, or walk for six hours; (3) she cannot engage in prolonged sitting, standing, or walking; (4) she requires a sit/stand option; (5) she can never climb ladders, ropes, or scaffolds; (6) she can occasionally balance, stoop, crouch, kneel, crawl, squat, or climb ramps/stairs; (7) she must avoid even moderate exposure to fumes, odors, dusts, gases, or poor ventilation; (8) she can never work at unprotected heights or with dangerous machinery; (9) she cannot drive; (10) she can only perform work that requires limited visual acuity; (11) she cannot perform work requiring the use of foot controls; and (12) she can only perform simple unskilled work. (Tr. 20).

With respect to Plaintiff's mental impairments the ALJ further concluded that Plaintiff experiences mild restrictions in the activities of daily living, mild difficulties in maintaining social functioning, mild difficulties maintaining concentration, persistence or pace, and has never experienced episodes of deterioration or decompensation in work or work-like settings. (Tr. 19).

16

After reviewing the relevant medical evidence, the Court concludes that the ALJ's determination as to Plaintiff's RFC is supported by substantial evidence.

The ALJ determined that Plaintiff was unable to perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding.  *See Richardson*, 735 F.2d at 964.

While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform specific jobs" is needed to meet the burden.  *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added).  This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy.  *See Richardson*, 735 F.2d at 964.  Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding.  Such was the case here, as the ALJ questioned vocational expert Sharon Princer.

The vocational expert testified that there existed approximately 6,000 jobs which an individual with Plaintiff's RFC could perform, such limitations notwithstanding.  (Tr. 824-30).  This represents a significant number of jobs.  *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990) (a finding that 2,500 jobs existed which the claimant could perform constituted a significant number); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988) (the existence of 1,800 jobs which the claimant could perform satisfied the significance threshold).

a.   The ALJ Properly Evaluated the Medical Evidence

On October 20, 2003, Betty Dawson completed a report regarding Plaintiff's limitations. (Tr. 671-73). Dawson reported that Plaintiff can frequently lift five pounds and can occasionally lift up to 25 pounds. (Tr. 673). She reported that Plaintiff cannot use her extremities to perform repetitive manipulation activities or operate foot controls. Dawson reported that Plaintiff experiences limitations in reading, writing, following directions, comprehension, and memory. She offered no opinion as to the length of time Plaintiff can sit, stand, or walk during an 8-hour workday. *Id.* Dawson reported that Plaintiff cannot drive an automobile. (Tr. 671). Dawson concluded that Plaintiff cannot "work at any job." *Id.* Plaintiff asserts that because Dawson was her treating physician, the ALJ was obligated to accord controlling weight to her opinion.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into his medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). Accordingly, the medical opinions and diagnoses of treating physicians are given substantial deference, and if such opinions and diagnoses are uncontradicted, complete deference is appropriate. *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ is not bound by conclusory statements, particularly when unsupported by detailed objective criteria and documentation. *See Cohen*, 964 F.2d at 528. The ALJ need not defer to an opinion contradicted by substantial medical evidence. *See Cutlip v. Sec'y of*

18

*Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).  Finally, when according less than controlling weight to the opinion of a treating physician, the ALJ must specifically articulate her rationale for doing so.  *See Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544-45 (6th Cir. 2004).

While the ALJ referred to Betty Dawson as a doctor, she is, in fact, a family nurse practitioner.  (Tr. 9).  As such, she is not considered a treating physician and her opinion is entitled to no special deference.  *See* 20 C.F.R. § 404.1513.  As Defendant correctly asserts, however, even if nurse Dawson were considered a treating physician her opinion was properly evaluated by the ALJ.

To the extent that nurse Dawson articulated specific limitations from which Plaintiff suffers, the ALJ largely adopted such.  Moreover, the ALJ's RFC determination imposes on Plaintiff limitations in excess of those articulated by nurse Dawson.  The only part of nurse Dawson's opinion which the ALJ simply disregarded was the nurse's opinion that Plaintiff cannot "work at any job."  To the extent that nurse Dawson asserts that Plaintiff is disabled, such is entitled to no deference because the determination of disability is a matter left to the commissioner.  *See* 20 C.F.R. § 404.1527(e)(1).

As the medical evidence detailed above makes clear, Plaintiff's impairments do not render her completely disabled.  Plaintiff's treating physicians have never articulated the opinion that Plaintiff is unable to perform any and all work activities, but have instead asserted that Plaintiff is capable of performing activities consistent with the ALJ's RFC determination.  In sum, the ALJ properly evaluated the medical evidence in this matter.

19

b. The ALJ Properly Discounted Plaintiff's Subjective Allegations

The ALJ concluded that Plaintiff's "testimony with respect to the extent and severity of her impairments and resulting functional limitations is not entirely credible." (Tr. 18-19). Plaintiff asserts that the ALJ improperly discounted her subjective allegations.

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, *may* be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984) (emphasis added). As the relevant Social Security regulations make clear, however, a claimant's "statements about [his] pain or other symptoms will not alone establish that [he is] disabled." 20 C.F.R. § 404.1529(a); *see also*, *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)). Instead, as the Sixth Circuit has established, a claimant's assertions of disabling pain and limitation are evaluated pursuant to the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citations omitted). This standard is often referred to as the *Duncan* standard. *See Workman v. Commissioner of Social Security*, 2004 WL 1745782 at *6 (6th Cir., July 29, 2004).

Accordingly, as the Sixth Circuit has repeatedly held, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)).

20

However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Workman*, 2004 WL 1745782 at *6 (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Workman*, 2004 WL 1745782 at *6 (citing *Walters*, 127 F.3d at 531); *see also*, *Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony").  It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand.  The ALJ found Plaintiff's subjective allegations to not be fully credible, a finding that should not be lightly disregarded.  *See Varley v. Sec'y of Health and Human Services*, 820 F.2d 777, 780 (6th Cir. 1987).

It is not disputed that Plaintiff suffers from severe impairments.  However, as the ALJ properly concluded, Plaintiff's subjective allegations of disabling pain and limitation are not supported by objective medical evidence.  None of Plaintiff's treating physicians have imposed on Plaintiff limitations which are inconsistent with the ALJ's RFC determination.  Moreover, Plaintiff's reported activities are inconsistent with her allegations of total disability.  In sum, there exists substantial evidence to support the ALJ's credibility determination.

c.   The ALJ Properly Relied on the Vocational Expert's Testimony

Plaintiff asserts that the ALJ relied upon the response to an inaccurate hypothetical question.  While the ALJ may satisfy his burden through the use of hypothetical questions posed to a vocational expert, such hypothetical questions must accurately portray the claimant's physical and mental impairments.  *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996).

The hypothetical question which the ALJ posed to the vocational expert simply asked whether there existed jobs which an individual could perform consistent with Plaintiff's limitations, to which the vocational expert indicated that there existed approximately 6,000 such jobs.  Because there was nothing improper or incomplete about the hypothetical questions he posed to the vocational expert, the ALJ properly relied upon her response thereto.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence.  Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Date:  August 1, 2006                                  /s/ Ellen S. Carmody
                                                       ELLEN S. CARMODY
                                                       United States Magistrate Judge